1
2
3
4
5
6
7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   SHIRLEY ANN TORRENCE,                     Case No. 09-CV-001917-JLT

12                    Plaintiff,               ORDER REGARDING PLAINTIFF'S
                                               SOCIAL SECURITY COMPLAINT
13        vs.
                                               ORDER DIRECTING THE ENTRY OF
14                                             JUDGMENT FOR DEFENDANT
                                               MICHAEL J. ASTRUE, COMMISSIONER OF
15   MICHAEL J. ASTRUE,                        SOCIAL SECURITY, AND AGAINST
     Commissioner of Social Security,         PLAINTIFF SHIRLEY ANN TORRENCE
16
                     Defendant.
17   _____/

18                              **BACKGROUND**

19        Shirley Anne Torrence ("Plaintiff") seeks judicial review of an administrative decision

20   denying her claims for disability insurance benefits ("DIB") and supplemental security income

21   ("SSI") benefits, arising under Title II and Title XVI of the Social Security Act ("the Act"),

22   respectively.

23                     **FACTS AND PRIOR PROCEEDINGS**[1]

24        Plaintiff's first application for DIB was denied at the initial stage on September 8, 2005.  AR

25   at 127.  Plaintiff filed the current application for DBI and SSI on May 21, 2007.  AR at 109.  The

26   Social Security Administration denied benefits on January 1, 2008.  Id. at 79.  Upon reconsideration,

27   _____

28   [1]  References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

                                        1

benefits were denied again on March 14, 2008.  Id. at 82.  Subsequently, Plaintiff requested a hearing

before an administrative law judge ("ALJ"); the ALJ issued a decision denying benefits on June 10,

2009.  Id. at 9-15.  Though Plaintiff requested review, the Appeals Council denied her request on

September 16, 2009.  Id. at 1-4.  Therefore, the ALJ's decision became the decision of the

Commissioner.

Hearing Testimony

On March 11, 2009, Plaintiff testified with the assistance of counsel at the hearing before the

ALJ.  AR at 19.  Plaintiff testified that she was born on October 31, 1949.  Id.  According to

Plaintiff, the highest grade she completed was high school, though she took "about two units "of

college courses and child development vocational training.  Id. at 22.  Plaintiff, who is unmarried,

lived at her sister's home, along with her own adult daughter, and her sister's foster son.  Id.

Plaintiff stated that she has a driver's license, and she could take care of personal needs

without help.  AR at 20.  Plaintiff reported that she cooked, did the laundry, and assisted in cleaning

the house.  Id. at 20-21.  Plaintiff estimated that she watched television about six hours and read two

to three hours a day.  Id. at 21.  She reported that rarely visited with friends or family, but was able to

attend church.  Id. at 21-22.  With most of her time, Plaintiff stated that she took care of her

daughter: "I can't to do anything but take care of her.  That's it.  And, you know, it's very consuming

and very hard."  Id. at 30.

Plaintiff testified that she had problems with thyroid disease, high blood pressure, anxiety,

depression, some heart problems that "they're checking into," back problems, and endometriosis.

AR at 23.  When Plaintiff required assistance from a doctor, she would visit Dr. Chopra, whom she

estimated seeing once a month.  Id. at 24.  Plaintiff has received medication for her thyroid, high

blood pressure, and anxiety.  Id.

With regard to her problem with depression, Plaintiff stated that she felt "[o]verwhelmed,

tired, [and] fatigued a lot."  AR at 25.  When feeling depressed, she said that she would "just want to

lay down…and kind of forget some things."  Id.  Plaintiff reported that the anxiety that she suffered

was not brought on by being around others or crowds, but only by her personal circumstances.  Id. at

29-30.  She testified that her trouble with anxiety lead to other difficulties: "I would get sick to my

stomach… I would go to the hospital often, and chronic diarrhea, and nausea, and no appetite for days, and losing weight." Id. However, Plaintiff believed the Xanax she received from the doctor helped with her depression and anxiety. Id. at 26. She stated that the medication did not cause any negative side effects for her. Id. at 28. Upon examination by counsel, Plaintiff stated that the reason she could not work was the "ongoing" problem with her stomach, along with nausea and a rapid heartbeat. Id. at 29. At nighttime, she said that she has to go to the restroom frequently. Id.

Plaintiff said that she did not have any problems with standing. AR at 24. She estimated that she was able to stand "two hours straight through" and walk probably half a mile to a mile. Id. at 24-25. Plaintiff believed she could lift five to ten pounds, and had no problems lifting her arms overhead. Id. at 25. During the day, Plaintiff said that she had to take breaks and rest or lay down "about twice a day…[f]rom 30 minutes to an hour." Id. at 28. She said that she took these breaks when her heart raced. Id.

Plaintiff testified about her prior work history. She said that she worked at Reese's "back in the 80's" and at Kraft as an assembler, ending in 1995. AR at 31. While at Kraft, Plaintiff estimated that the heaviest things she lifted were twenty to twenty-five pound boxes of cheese. Id. at 31-32. While at work, she rotated through lifting these boxes steadily for an hour, conducting inspections, packing cheese on an assembly line, and running a pelletizer or a forklift. Id. at 32-33.

A vocational expert ("VE"), Tom Daschlet, testified. The VE testified that Plaintiff's past relevant work at Kraft was a combination of occupations in the Dictionary of Occupational Titles ("DOT"): assembly work was "light, unskilled," hand packaging was "medium unskilled," and operating a forklift was "medium, semiskilled." AR at 34-35. Consequently, the VE opined that the work at Kraft Foods had "medium physical demand." Id. at 35. The VE opined that there were not any transferable skills "to a lesser physical demand." Id. Then, the ALJ posed hypothetical situations to the VE.

In the first hypothetical, the VE was asked to assume a person of Plaintiff's age, education, and work history (including her work at Kraft and as a day care provider). AR at 36. The ALJ described a person who could lift 40 pounds occasionally and 20 pounds frequently. Id. The individual could also sit, stand, and/or walk six out of eight hours. The VE responded that this

person would be able to do Plaintiff's past relevant work and said that "work at the nursery school as attendant is within this parameter."  Id.  Further, the VE opined that he would also consider the "combination of light assembly, packaging, and forklift" as possible, but that the work as a nursery school attendant "just as presented in the DOT…is the only one that clearly fits."  Id.

Next, the ALJ hypothesized a worker of Plaintiff's background who could lift ten pounds occasionally and frequently.  AR at 36.  In addition, the person could sit, stand, or walk six out of eight hours.  Id.  The VE responded that the person could not perform any of Plaintiff's past relevant work.  Id.  However, the VE opined that "the full range of sedentary unskilled work" available to such an individual.  Id. at 37.  In giving examples of jobs available in economy, the VE named the positions of ampoule sealer and loader of semiconductor dies.  Id.  Adding the assumption that the individual could drive, the VE opined the person could work also as an escort driver.  Id.

Relevant Medical Evidence

Plaintiff received treatment from Dr. Jatinder Chopra, M.D., at the Tulare Community Health Clinic.  (Doc. 12 at 2; see also AR at 179-228)  In October 2003, Dr. Chopra diagnosed her with hypothyroidism, generalized anxiety disorder, and hypertension.  AR at 179.  Plaintiff reported feeling weak and tired.  Id.  Dr. Chopra noted that Plaintiff's vital signs were stable and her heart rate and rhythm were normal.  Id.

In 2004, Plaintiff visited Dr. Chopra three times, including two visits for prescription refills.  AR 180-82.  In April and September, Plaintiff complained of pain to Dr. Chopra.  Id.  In September 2004, Dr. Chopra diagnosed Plaintiff with back pain and arthritis, in addition to the generalized anxiety disorder and hypothyroidism because Plaintiff complained of "generalized pain in her muscles."  Id. at 181.  However, Dr. Chopra did not repeat the diagnosis of arthritis when Plaintiff returned to the Tulare Community Health Clinic in November 2004 for treatment of acute bronchitis.  Id. at 180.

Treatment notes show that Plaintiff was treated for diarrhea repeatedly during 2005 and continuing into 2006.  See AR 183-91.  On March 4, 2005, Plaintiff reported that she had suffered diarrhea and fatigue for four days.  Id. at 183.  In August 2005, Plaintiff "went to the emergency room because of nausea, vomiting and diarrhea."  Id. at 185.  At her follow-up appointment with Dr.

4

Chopra, he noted that Plaintiff "was found to have dehydration and [a] viral syndrome." Id.  On

September 16, 2005, Dr. Chopra noted that Plaintiff's diarrhea was not getting better, and prescribed

a trial medication.  Id. at 188.  In January 2006, Dr. Chopra noted that Plaintiff's diarrhea "is

progressively getting worse in spit[e] of all the treatment.  Id. at 189.  In March 2006, Dr. Chopra

diagnosed Plaintiff with peptic ulcer disease.  Id. at 190.

Plaintiff had a chest x-ray because she was having chest pain and headaches on November 5,

2006.  AR at 241.  The findings showed "no evidence of infiltrate, effusion, mass, or vascular

congestion."  Id.  However, there was "some hyperexpansion" and the aorta was "mildly tortuous."

Id.  Plaintiff's heart size was at the top of the normal range.  Id.  Plaintiff returned to Dr. Chopra two

days later on November 7 complaining of "abdominal and pelvic pain and pain in the rectal area."

Id. at 199.  Dr. Chopra proscribed trial medications, and found that her heart rate and rhythm were

normal.  Id.

On September 7, 2007, Plaintiff had a comprehensive internal medicine evaluation by Dr.

James Nowlan, Jr.  AR at 229.  Plaintiff complained of thyroid disease, heart problems, anxiety, high

blood pressure, and depression.  Id.  Upon examination, Dr. Nowlan found that Plaintiff "appeared

well."  Plaintiff's cardiovascular exam showed her heart rate and rhythm were normal, there was no

edema, and no extra sounds or murmurs were heard.  Id. at 230.  Plaintiff's motor strength was 5 out

of 5, and her reflexes were "normal."  Id. at 231.  In addition, her sensory exam gave "normal"

results.  After examining Plaintiff and reviewing her medical records, Dr. Nowlan diagnosed her

with hypothyroidism, controlled hypertension, and anxiety reaction.  Id.  Dr. Nowlan's functional

assessment was that Plaintiff "could stand and walk for six hours in an eight-hour day" and that

sitting time was unlimited.  Id. at 231-32.  In addition, Dr. Nowlan opined Plaintiff "could lift 20

pounds frequently and 40 pounds occasionally" without postural or manipulative limitations.  Id. at

232.

Dr. Greg Hirokawa performed a comprehensive psychiatric evaluation on Plaintiff on

October 21, 2007.  AR at 236.  Dr. Hirokawa did not receive any medical records to review, but

rather Plaintiff was the sole source of information.  Id.  Plaintiff reported her stress and anxiety was

"due to having to take care of her daughter who suffered a stroke approximately three years ago."  Id.

Plaintiff "appeared mildly depressed," and Plaintiff denied suicide attempts or ideations.  Id. at 237-38.  Dr. Hirokawa diagnosed Plaintiff with "adjustment disorder with mixed emotional features [and] polysubstance abuse in reported remission," and he assessed Plaintiff's global assessment functioning ("GAF") score as 61.[2]  Id. at 239.  Supporting this assessment, Dr. Hirokawa found that Plaintiff's "symptoms of depression and anxiety appeared to be within the mild range."  Id.  In addition, Plaintiff was "mildly limited" in the following abilities:  remembering location and work-like procedures; understanding and remembering either detailed or very short and simple instructions; carrying out instructions; maintaining attention, concentration, and pace; accepting instruction from a supervisor and responding appropriately to criticism; performing activities within a schedule, maintaining regular attendance and a schedule; and completing a normal workday and workweek without interruption from psychologically based symptoms; and interacting with coworkers.  Id. at 239-40.  Therefore, Dr. Hirokawa concluded that "[t]he likelihood of the claimant emotionally deteriorating in a work environment is minimal."  Id. at 240.

On October 23, 2007, Plaintiff visited the emergency room at Tulare District Hospital, complaining of diarrhea, nausea, abdominal pain, and chest pain.  AR at 244, 310.  Plaintiff was admitted for her chest pain to rule out a myocardial infarction.  Id. at 310.  The doctor there noted that the chest pain was "atypical," and hypothesized that "the symptoms may be part of her withdrawal from Xanax, too."  Id. at 310, 313.  Upon examination, Plaintiff's vital signs were stable.  Id. at 310.  Impressions included that Plaintiff suffered dehydration because of poor oral intake and diarrhea and vomiting, gastroesophageal reflux disease, and an anxiety disorder.  Id. at 313.

Dr. Glenn Ikawa examined the record and offered a psychiatric review on November 13, 2007.  AR at 245.  Dr. Ikawa found Plaintiff's medical impairments of an affective disorder and substance addiction disorders were not severe.  Id.  Specifically, Dr. Ikawa opined Plaintiff had an "adjustment [disorder] with mixed emotional features" and "polysubstance dependence, in

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed.) ("DSM-IV).  A GAF score of 61 indicates an individual who has "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or social functioning. . . but generally functioning pretty well, has some meaningful interpersonal relationships."  Id. at 34.

1  remission." Id. at 248, 251.  According to Dr. Ikawa, Plaintiff had mild limitations in restrictions of

2  activities of daily living, and no limitations with maintaining social functioning or maintaining

3  concentration, persistence or pace.  Id. at 253.

4      On December 5, 2007, Plaintiff underwent a 'new patient checkup' by Hanh Hoang, D.O.

5  AR at 256.  Plaintiff appeared "well developed, well nourished, [and] in no acute distress." Id. at

6  257.  Plaintiff's heart was "normal…without murmurs, rubs, gallops, or clicks."  Id.  The doctor

7  noted Plaintiff had normal bowel sounds and her abdomen was normal.  Id.  Additionally, she had

8  "normal sensation, reflexes, coordination, muscle strength and tone."  Id.

9      Dr. Chopra completed a residual functional capacity questionnaire on March 2, 2009.  AR at

10  326.  He noted that Plaintiff visited his office monthly, and stated that the treating relationship began

11  in November 2008.[3]  Id.  Dr. Chopra diagnosed plaintiff with hypertension ("HTN"), generalized

12  anxiety disorder ("GAD"), chronic pain, and hypothyroidism.  Id.  In addition, Dr. Chopra indicated

13  depression and anxiety affected Plaintiff's phsycial condition.  Id. at 326.  However, Dr. Chopra

14  indicated Plaintiff could tolerate moderate stress at work.  Id. at 328.  With regard to physical

15  abilities, Dr. Chopra stated Plaintiff could lift and 10 pounds frequently, 20 pounds occasionally, and

16  50 pounds rarely.  Id. at 329.  She had the ability to frequently twist; to occasionally stoop or bend,

17  climb ladders, and climb stairs; and to crouch, though rarely.  Id.  In a workday, Plaintiff could sit,

18  stand, or walk for about 4 hours.  Id. at 328.  Overall, Dr. Chopra opined that Plaintiff's prognosis

19  was "good" and her symptoms would interfere with attention and concentration only "occasionally,"

20  causing her to miss work about one day per month.  Id. at 326-27, 330.

21      ALJ Findings

22      The ALJ evaluated Plaintiff with the customary five-step evaluation.  Pursuant to this

23  sequential process, first the ALJ established Plaintiff had not engaged in substantial gainful activity

24  during the period from her alleged onset of disability on June 15, 2003.  AR at 11.  Second, the ALJ

25  found Plaintiff had one severe impairment: thyroid disease.  Id.  Though Plaintiff also suffered from

26

27  [3] Though Dr. Chopra indicates on this form that the approximate date of Plaintiff's first visit was November of
   2008 in the section regarding "nature, frequency, and length of contact," this is an error as other medical records indicate

28  he first treated Plaintiff in 2004.  See AR at 179, 326.

1  depression and anxiety, the ALJ opined there is "only minimal, if any, effect on her ability to do

2  work." Id.

3         Next, the ALJ found Plaintiff had mild difficulties and restrictions.  AR at 12.  Specifically,

4  the ALJ noted:

5         In activities of daily living, the claimant has mild restriction.  The claimant has a driver's
          license and drives, takes care of her personal needs, performs household chores, attends
6         church, and takes care of her wheelchair-bound daughter.

7         In social functioning, the claimant has mild difficulties.  The claimant lives with her
          daughter and her sister.  She attends church and has not claimed any problems dealing
8         with others.

9         With regard to concentration, persistence or pace, the claimant has mild difficulties.  The
          claimant testified that she has no concentration problems, but indicated that her
10        daughter's condition makes her anxious and she feels overwhelmed and tired.

11  Id.  Thus, the ALJ found no impairment, or combination of impairments, met or medically equaled

12  one of the listed impairments.  Id.

13        At the fourth step, the ALJ determined Plaintiff had the residual functional capacity ("RFC")

14  to lift and carry 20 pounds occasionally and 10 pounds frequently; and to sit, stand, and/or walk for

15  six hours in an eight-hour workday.  AR at 13.  Based upon medical evidence, and hearing

16  testimony, the ALJ believed Plaintiff retained the RFC to perform past relevant work as a nursery

17  school attendant.  Id. at 15.  Subsequently, the ALJ determined Plaintiff was not disabled as defined

18  by the Social Security Act from the alleged onset date of June 15, 2003, through the date of the

19  decision.  Id.

20                                    **STANDARD OF REVIEW**

21        District courts have a limited scope of judicial review for disability claims after a decision by

22  the Commissioner of Social Security to deny benefits under the Act.  When reviewing findings of

23  fact, the Court must determine whether the Commissioner's decision is supported by substantial

24  evidence or is based on legal error.  42 U.S.C. § 405(g).  The Court must uphold the ALJ's

25  determination that the claimant is not disabled if the proper legal standards were applied and the

26  findings are supported by substantial evidence.  See Sanchez v. Sec'y of Health & Human Serv., 812

27  F.2d 509, 510 (9th Cir. 1987).

28

1  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

2  reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S.

3  289, 401 (1971), quoting Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938).  The record as a whole

4  must be considered, as "[t]he court must consider both evidence that supports and evidence that

5  detracts from the ALJ's conclusion."  Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  "[W]hen

6  the evidence is susceptible to more than one rational interpretation," the decision of the ALJ will be

7  upheld by the Court.  Tommasetti v. Astrue, 533 F.3d 1035, 10389 (9th Cir. 2008).

8  **REVIEW**

9  In order to qualify for benefits under Title II and Title XVI of the Social Security Act, a

10  claimant must establish that she is unable to engage in substantial gainful activity due to a medically

11  determinable physical or mental impairment that has lasted or can be expected to last for a

12  continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be

13  considered to have a disability only if,

14  physical or mental impairment or impairments are of such severity that he is not only
   unable to do his previous work, but cannot, considering his age, education, and work
15  experience, engage in any other kind of substantial gainful work which exists in the
   national economy, regardless of whether such work exists in the immediate area in which
16  he lives, or whether a specific job vacancy exists for him, or whether he would be hired
   if he applied for work.

17

18  42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on the claimant to establish disability.  Terry v.

19  Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).  By showing an inability to perform past relevant

20  work, the claimant establishes a prima facie case of disability.  Maounis v. Heckler, 738 F.2d 1032,

21  1034 (9th Cir. 1984).  Upon such showing, the burden shifts to the Commissioner to prove the

22  claimant is able to engage in other substantial gainful employment.  Id.

23  To achieve uniform decisions, the Commissioner established regulations that include the

24  aforementioned five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520(a)-(f),

25  416,920(a)-(f) (1994).  As noted, applying that process, the ALJ found that Plaintiff: (1) had not

26  engaged in substantial gainful activity since June 15, 2003; (2) had a medically determinable severe

27  impairment (thyroid disease); (3) did not have an impairment or combination of impairments that

28  met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; (4)

was able to perform her past relevant work; and (5) retained the ability to perform other work at the state and national level in significant numbers. AR at 9-15. The ALJ then determined Plaintiff was not "disabled" as defined in the Act. Id. at 15.

## DISCUSSION

Plaintiff asserts the ALJ erred in failing to adopt the opinion of the treating physician (Dr. Chopra) and to find Plaintiff credible. (Doc. 12 at 5) In conjunction with these allegations, Plaintiff argues that the record supports Dr. Chopra's opinion, and that his opinion supports Plaintiff's statements regarding her limitations. Id. at 7, 10.

A.  The ALJ properly rejected the treating physician's opinion.

The defendant argues that "the ALJ did not reject Dr. Chopra's opinion in its entirety." (Doc. 13 at 11) Plaintiff agrees, asserting that the error is that the ALJ failed "to adopt *all* of the opinion of the treating physician" (Doc. 15 at 1, emphasis added) Specifically, the ALJ rejected the portion of the assessment "that the claimant could sit about 4 hours out of an 8 hour day and stand/walk about 4 hours of an 8 hour day." (Doc. 12 at 12) Therefore, the Court will address the rejected portion of the opinion. Notably, the opinion of a treating physician may be rejected whether the opinion is contradicted by another. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

1.  The ALJ gave less weight than is required generally to the treating physician's opinion.

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). The opinion of a treating physician is generally afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. Id.; see also 20 C.F.R. § 404.1527(d)(2); Magallanes, 881 F.2d at 751. Generally, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2). Using these standards, Dr. Chopra's opinion is afforded the greatest weight because Plaintiff was under his care at the Tulare Community Health Clinic and continued to see him at his new office. Dr. Nowlan and Dr. Hirokawa, who examined Plaintiff but did not treat her, were "examining physicians;" their opinions are second to that of Dr.

Chopra, but should be given more weight than the opinions of doctors who reviewed only the record (Dr. Ikawa and Dr. Middleton).

However, the ALJ gave less weight to Dr. Chopra's opinion because "there was "nothing in his own records or in any of the other evidence warranting such significant mental, sitting, standing, or walking limitations" and the records showed a "paucity of symptoms and treatment." AR at 14. Evaluating the Dr. Chopra's opinion, the ALJ noted that the treatment records, covering December 2000 through November 2007 and November 2008 through February 2009, "show only medication management for hypothyroidism, anxiety, hypertension, depression and routine but intermittent symptoms including back pain, fatigue, and nausea. Dr. Chopra did not refer the claimant to any specialists or recommend any more invasive or aggressive treatment than medication." Id. Also, the ALJ noted that the medical records not provided from Dr. Chopra "show only medication management" for Plaintiff's impairments. Id. Therefore, the ALJ gave significant weight to the opinion of Dr. Nowlan because it was consistent with evidence in the records and Plaintiff's testimony. Id.

> 2. Dr. Chopra's opinion was inconsistent with his own records, which is a specific and legitimate reason for rejecting the opinion.

The Ninth Circuit held that incongruity between a treating doctor's assessment and his medical records provides a specific and legitimate reason for rejecting the opinion. Tommasetti, 533 F.3d at 1041. In Tommasetti, the treating physician completed a residual functional capacity questionnaire in which she indicated the claimant could sit a maximum of four hours in an eight-hour workday, stand for up to two hours, and only lift 10 pounds. Id. at 1037. However, the ALJ found that these conclusions "did not mesh with [the doctor's] objective data or history" and that the "medical records do not provide support for the limitations set out in the [q]uestionnaire." Id. at 1041. Similarly, here the ALJ found that the physical limitations set forth by Dr. Chopra were not supported by the medical records: "there is nothing in his own records or in any of the other evidence warranting such significant mental, sitting, standing, or walking limitations." AR at 14.

///

///

11

3.  The ALJ set forth substantial evidence in his decision to reject Dr. Chopra's opinion.

When contradicted by another physician, the treating physician's opinion may be rejected only with "specific and legitimate reasons for doing so that are based on substantial evidence in the record.  Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983).  This burden can be met by the ALJ "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Magallanes, 881 F.2d 751.  Where an examining physician "provides independent clinical findings that differ from the findings of the treating physician, such findings are substantial evidence.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007), quoting Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985) (internal quotations omitted).  By itself, the contrary opinion of a non-examining physician does not constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, but when consistent with other evidence in the record, it can constitute substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  Thus, where the ALJ rejects the opinion of a treating physician, at least in part, based on the opinion of a consulting physician, there must be additional evidence in the record to support the decision.  Lester, 81 F.3d at 832.  Here, the ALJ cited the record as evidence for his rejection, including the opinion of Dr. Nowlan.

The opinion of Dr. Nowlan, an examining physician, may constitute substantial evidence to support the ALJ's conclusion if he offered independent clinical findings which resulted in (1) diagnoses differing from those offered by the treating physician and are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not considered.  See Orn, 495 F.3d at 632; Magallanes, 881 F.3d at 751.  Notably, both Dr. Nowlan and Dr. Chopra diagnosed Plaintiff with hypertension, anxiety, and hypothyroidism.  See AR 231, 326.  However, Dr. Nowlan conducted a "comprehensive internal medicine evaluation" that was based, in part, upon objective medical testing.  Id. at 229-32.  Based upon his objective findings and his observations, Dr. Nowlan determined Plaintiff had the abilities set forth in his findings and identified above by the Court.  Id. at 231-32.  Therefore, the opinion of Dr. Nowlan is substantial evidence to support the ALJ's decision to reject Dr. Chopra's opinion.

///

12

B.  The ALJ did not err in discounting Plaintiff's symptom testimony.

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are credible to the extent they are consistent with the…residual functional capacity assessment."  AR at 14.  Based upon this assessment of credibility, Plaintiff argues that the ALJ improperly found that Plaintiff lacked credibility.  Specifically, Plaintiff asserts that the "longitudinal history of treatment" supports Plaintiff's claims regarding the severity of her symptoms.  (Doc. 12 at 10)   In addition, Plaintiff maintains that "there is no clear and convincing reason[] to find the claimant not credible."  Id.

An adverse finding of credibility must be based upon clear and convincing evidence absent affirmative evidence of malingering and "[w]here the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains."  Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1160 (9th Cir. 1991).  The ALJ may not discredit a claimant's testimony as to the severity of symptoms simply because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991).  In addition, the ALJ "must identify what testimony is credible and what evidence undermines the claimant's complaints."  Lester v. Chater, 81 F.3d 821, 834; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  A credibility finding must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [the] claimant's testimony."  Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).  Factors that may be considered include: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimants daily activities; (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); see also Thomas, 278 F.3d at 958-59 (9th Cir. 2002).

Many of the above factors were considered by the ALJ as he determined that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of [her] symptoms" had limited

1  credibility.  See AR at 13-15.  The ALJ found Plaintiff's level of activities are not consistent with her

2  claim of disability.  For example, the ALJ noted, "Allegedly the claimant cannot walk very far

3  without complaining of pain and burning in her legs and numbness in her hands.  However, she also

4  stated that the claimant performs all the household chores, drives, shops, pays bills and handles all

5  household finances."  Id. at 14.  In Thomas, the claimant's ability to perform household chores was

6  considered as inconsistent with the claimant's subjective complaints and as a basis for finding that

7  she lacked credibility with respect to her descriptions of pain.  Thomas, 278 F.3d at 959.  Similarly,

8  the ALJ's finding that the description of pain was inconsistent with her ability to do the household

9  chores, drive and shop was a valid finding in support of the RFC.

10      In addition to Plaintiff's admitted daily activities, the ALJ considered the medical evidence

11  and the extent to which it supported Plaintiff's claimed severity of symptoms.  Plaintiff argues,

12      Persistent attempts by the individual to obtain relief of pain or other symptoms such as
        by increasing medication, trials of a variety of treatment modalities in an attempt to find
13      one that works [and] that does not have side effects, referrals to specialists or changing
        treatment sources may be a strong indication that symptoms are a source of distress to
14      the individual and generally lend support to an individual's allegation of intense and
        persistent symptoms.
15

16  (Doc. 12 at 10, quoting SSR 96-7p)  To the extent this may be true, the ALJ addressed these

17  concerns.  For example, the ALJ noted specifically that that the treating physician "did not refer the

18  claimant to any specialists or recommend any more invasive or aggressive treatment than

19  medication."  AR at 14.  When it was determined that Plaintiff's chest pain was not a cardiac

20  problem in October 2007, there was no follow-up regarding her pain.  Id.  As noted above, the ALJ

21  commented that the treatment notes "show only medication management" for Plaintiff's symptoms.

22  Id.  The amount of treatment Plaintiff received is a permissible consideration in credibility findings.

23  See Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("evidence of 'conservative treatment' is

24  sufficient to discount a claimant's testimony regarding severity of an impairment").

25      Given these considerations, it is clear that in making the credibility finding, the ALJ

26  considered many factors, including her daily activities, the treatment she received for her symptoms,

27  and the conclusions of doctors such as Dr. Nowlan, whose opinion offered substantial evidence in

28  support of the RFC articulated by the ALJ.  Where the ALJ's credibility finding is supported by

14

1  substantial evidence, the Court "may not engage in second-guessing." <u>Thomas</u>, 278 F.2d at 959.

2  Therefore, the Court will not disturb the ALJ's finding that Plaintiff's statements concerning the

3  intensity, persistence, and limiting effects of these symptoms are had limited credibility.

4  **<u>CONCLUSION</u>**

5  For all these reasons, the Court concludes that the ALJ cited substantial evidence in the

6  record to support his conclusion that Plaintiff could perform work and was not disabled.  Substantial

7  evidence supported his decision to not adopt Dr. Chopra's entire opinion.  In addition, it is clear that

8  the ALJ did not arbitrarily determine Plaintiff's credibility, and the partial rejection of it was

9  supported by consideration of her daily activities, testimony, and the medical evidence.

10  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the

11  Commissioner of Social Security.  The Clerk of Court IS DIRECTED to enter judgment in favor of

12  Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff Shirley Ann

13  Torrence.

14

15  IT IS SO ORDERED.

16  Dated:   **November 24, 2010**                                    **/s/ Jennifer L. Thurston**
                                                                     UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28